COMER v. POWELL et al.    (No. 1042.)

(Court of Civil Appeals of Texas. Amarillo. Oct. 25, 1916.)

1. GAMING ⊂⊃11—PUBLIC POLICY—"WAGERING CONTRACT."

An agreement by a thrasher, after looking over a farmer's wheat ricks, that he would give the farmer 4,350 bushels of wheat therefor, the thresher to retain any excess thrashed therefrom and to make good to the farmer any deficiency necessary to make up the 4,350 bushels, was unenforceable as being a "wagering contract," void as against public policy, and not a sale (quoting Words and Phrases, First and Second Series, Wagering Contract).

[Ed. Note.—For other cases, see Gaming, Cent. Dig. §§ 19–21, 23, 26; Dec. Dig. ⊂⊃ 11.]

2. EXEMPTIONS ⊂⊃45—TOOLS AND APPARATUS OF TRADE—"TOOLS OF TRADE"—"APPARATUS OF TRADE."

A thrashing outfit is not exempt property as "tools of trade," or "apparatus of trade."

[Ed. Note.—For other cases, see Exemptions, Cent. Dig. §§ 56–61; Dec. Dig. ⊂⊃45.

For other definitions, see Words and Phrases, First and Second Series, Apparatus, Tools of Trade.]

3. ATTACHMENT ⊂⊃357—WRONGFUL ATTACHMENT — DEFECT IN PROCEEDINGS — UNTRUE GROUND IN AFFIDAVIT.

An attachment is wrongfully issued if based upon affidavit stating, untruthfully, that defendant is justly indebted to plaintiff.

[Ed. Note.—For other cases, see Attachment, Cent. Dig. §§ 1037, 1309, 1310; Dec. Dig. ⊂⊃ 357.]

4. ATTACHMENT ⊂⊃375(2) — DAMAGES FOR WRONGFUL ATTACHMENT.

A writ of attachment, wrongfully issued and levied on property, entitles the owner thereof to at least nominal damages, although the property be not exempt.

[Ed. Note.—For other cases, see Attachment, Cent. Dig. §§ 1387, 1398, 1399; Dec. Dig. ⊂⊃ 375(2).]

Appeal from Roberts County Court; J. E. Kinney, Judge.

Action by G. N. Powell and others against C. R. Comer. From a judgment, defendant appeals. Reversed, and in part rendered and in part remanded.

Baker & Willis, of Canadian, and Troy Smith, of Tyler, for appellant. Coffee & Holmes, of Miami, and M. J. R. Jackson, of Amarillo, for appellees.

HALL, J. Appellee Powell, joined by his two sons, as plaintiffs, sued appellant Comer, alleging that on or about September 1, 1915, Powell and his sons were the owners of certain wheat in ricks in the field, which had been harvested from 325 acres of land; that they sold the wheat to Comer at the estimated and agreed amount of 4,350 bushels, as follows: That after they had examined the wheat together, Comer made an offer to purchase the same, and to give plaintiffs therefor 4,350 bushels thrashed and delivered in plaintiff's wagons on the premises. That all over and above 4,350 bushels which might be thrashed from the wheat as it then stood was to belong to Comer, and if the ricks did not thrash out the 4,350 bushels, then Comer should make up the difference to plaintiffs. Plaintiffs accepted said offer and Comer thrashed and delivered from said ricks 3,893½ bushels, but refused to deliver a sufficient amount to make 4,350 bushels. That the wheat was worth 95 cents per bushel, and judgment was asked for the value of the difference in bushels between 3,893½ and 4,350. A writ of attachment was also sued out and levied upon a separator and engine, belonging to defendant Comer. Comer answered that the contract lacked consideration; that it was not based on any profit or benefit that could have accrued to defendant, nor any loss or detriment to plaintiffs, but was based on the mere chance of gain or loss to the defendant, according to the happening of an uncertain future event, namely, the amount of the yield of the wheat in thrashing; that it was a wagering contract, in that it was based on the happening of the uncertain event as to whether the wheat then in ricks would thrash out more or less than 4,350 bushels; that there were in reality only 3,893½ bushels which could be thrashed, and that the contract was therefore physically incapable of performance; that the contract was void for want of mutuality; that it had been reduced to writing, and contained a stipulation that appellant Comer should thrash appellees' wheat, and should receive therefor all above 4,350 bushels; that the contract was induced by fraudulent representations on the part of plaintiff, leading defendant to believe that there were more than 4,350 bushels in the field. Defendant reconvened for damages in the sum of $311, being the value of his services in thrashing

---

⊂⊃For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

the wheat, and sued also for damages for the wrongful and malicious levy of the attachment writ upon his thrashing outfit. A trial before a jury resulted in a verdict and judgment against defendant Comer for $201.85.

[1] The first proposition urged is that the contract as made, being a wager, is void because against public policy. Appellee Powell testified, in substance: That Comer came to his farm about the last day of August to secure his crop to thrash; that he told Comer he had been talking to other thrashers, but had not closed a deal with them. In the conversation Comer asked him what he thought his wheat would make. The witness told him it was not as good as some other wheat in the county, from the simple fact that hail had damaged it. Comer then said, "You will make 5,000 or 6,000 bushels," to which witness replied that he did not think so. Comer said he was thrashing at Mr. Eller's, whose wheat was turning out better than everybody expected, and that witness' wheat would turn out better, and then asked witness what he would take for his wheat crop, saying, "Let me thrash it at my expense and turn it over." Witness replied, "4,500 bushels." Comer then proposed to ride down and look at the wheat. That they looked at three ricks on the north side of a turnrow running through the field, then crossed over to the south side and looked over the ricks there. Witness told Comer that there were either 68, 70, or 72 ricks; that he did not remember exactly the number; that Comer examined the wheat and tested it, and finally said he would give witness 4,250 bushels for the crop, which witness refused to take. Then Comer said, "I will give you 4,300," which witness also refused. Finally they agreed to split the difference and made the amount 4,350 bushels. After examining the wheat further witness said:

"If we deal I do not want any quibbling. We make the deal on 68 ricks, more or less, you may thrash these two fields and 38 acres volunteer wheat, and I will split with you and take 4,350 bushels, which Comer agreed to do." "After we went back to the house I told one of my boys the deal we had made, as he had an interest in the crop, and the boy said, 'And in the event there is not 4,350 bushels, what are you to do about it?' Comer said 'I am to make 4,350 bushels good'; that he would make the shortage good."

While plaintiff alleged that the transaction was a sale, it is clear from the evidence that such allegation is not true. Comer did not purchase from Powell, nor did the latter sell Comer any wheat. It was simply a transaction based upon the belief on the part of Comer that the ricks of wheat owned by Powell contained considerably more than 4,350 bushels, and his proposition was made with no intention whatever of becoming the owner of any of the 4,350 bushels, but with the hope of gaining a liberal excess over that amount. The question squarely presented is, Is the transaction a wagering contract?

Briefly stated, Comer undertakes to thrash 4,350 bushels of wheat for Powell gratis, and guarantees that said ricks contain that amount, in consideration of which he is to have any excess which the ricks may contain. On the other hand, Powell is guaranteed 4,350 bushels of wheat thrashed without expense, but loses any amount in excess thereof which said ricks may possibly contain. Referring to Words and Phrases, vol. 8, p. 7365 et seq., we quote the following definitions of the terms "Wager" and "Wagering Contract":

"Bouvier defines a 'wager' as follows: Wager, a bet; a contract by which two persons or more agree that a certain sum of money or other thing shall be paid or delivered to one of them on the happening or not happening of an uncertain event (citing authorities). This definition implies that to every wager there must be two or more contracting parties having mutual or reciprocal rights in respect to the money or other things that are wagered, and usually called stakes of the bet or wager, and that each of the parties shall jeopardize something and have the chance to make something, or to recover the stakes or thing, bet, or wager upon the determining of the contingent or uncertain event in his favor. Jordan v. Kent, 44 How. Prac. (N. Y.) 206; Treacy v. Chinn, 79 Mo. App. 648."

"A wager is defined as a contract in which the parties stipulate that they shall gain or lose upon the happening of an uncertain event in which they have no interest, except that arising from the possibility of such gain or loss. Fareira v. Gabell, 89 Pa. 89; Kitchen v. Loudenback, 48 Ohio St. 177, 26 N. E. 979, 29 Am. St. Rep. 540."

"A bet or wager is ordinarily an agreement between two or more that a sum of money or some valuable thing in contributing which all agree to take part shall become the property of one or some of them on the happening in the future of an event at the present uncertain, or upon the ascertainment of a fact in dispute. This definition, though not exhaustive, sufficiently expresses what is meant by a wager. The essential elements of an ordinary waging contract are: (1) An agreement by one party to pay another a sum of money or give something of value if a certain event happens; (2) a reciprocal agreement by the second party to pay the first a sum of money or give something of value if a contrary event happens; and (3) that the event contemplated in the agreement shall be something other than the passing of a consideration between the parties. Winward v. Lincoln, 23 R. I. 476, 51 Atl. 106, 112, 64 L. R. A. 160."

"A wager is something hazarded on the issue of some uncertain event. Cassard v. Hinman, 14 N. Y. Super. Ct. (1 Bosw.) 207, 213."

"A wager is a bet or stake laid upon the result of a gain or upon acts to be done, events to happen, or facts existing or to exist. Woodcock v. McQueen, 11 Ind. 14, 15."

"A wager is a bet which is a pledge, as of money to be paid to another in a certain event, the other pledging to pay a forfeit in the contrary event. Ballard v. Brown, 67 Vt. 586, 32 Atl. 485."

We quote the following definitions from Words and Phrases, 2d Series, vol. 4, p. 1217 et seq.:

"The essence of a wager is that each party stands to win or lose on the result, and that the gains depend on the event. Thompson v. Williamson, 67 N. J. Eq. 212, 58 Atl. 602."

"A wager is a contract by which two or more parties agree that a certain sum of money or other thing shall be paid or delivered to one of

them on the happening of an uncertain event. A wager is an agreement between parties differing as to an uncertain fact or forecast of a future event. Wright v. Stewart [C. C.] 130 Fed. 905."

The above definitions have been framed by the courts with reference to the facts of the several cases in which they are found, and, of course, none of them are exactly applicable here.

"In a great majority of the states all wagering contracts have been expressly repudiated by the courts as void, whether the parties have any interest in the event beyond what is created by the wager or not." Harvey v. Merrill, 150 Mass. 1, 22 N. E. 49, 5 L. R. A. 200, and note, 15 Am. St. Rep. 159, 6 R. C. L. "Contracts," § 182.

"The uniform tendency of the later decisions is to treat gaming contracts and all wagers as utterly void. We feel ourselves authorized to conform our decisions to the public policy and to the sense of morality which the modern decisions and the modern legislation on the subject of gaming and wagers so clearly indicate. We find that the ancient rule of the common law was subject to certain exceptions, and in proportion as the courts have considered these questions, these exceptions to the ancient rule have been adjudged to be more and more comprehensive in their embrace, until, as has been said, the exceptions to the rule have taken the place of the rule itself. We think that, in the true spirit and meaning of the exceptions to the old rule, all idle wagers and all gaming contracts may be properly held to be void: (1) Because it is contrary to sound public policy that courts of justice should be required to enforce contracts into which there does not enter the element of a good or valuable consideration, in the just sense of these words. What consideration is it for the payment of $1,000 that one man shall leap farther than another at three leaps? If A. agrees with B. that he will pay him $1,000 if a certain horse belongs to C., but if the horse belongs to B., then B. shall pay A. the like sum, where is the consideration of such a contract? There can be no consideration but the mutual risk to which each party subjects himself. And can it be said to be sound public policy to permit parties to take such risks, upon such trifling and frivolous issues? We think not." Monroe v. Smelly, 25 Tex. 586, 78 Am. Dec. 541.

In the instant case Comer received no consideration whatever for his labor and expense in thrashing Powell's wheat, and, furthermore, this suit is instituted to recover the price of additional wheat which he hazarded on the uncertain event. We think the definition quoted above from Fareira v. Gabell, restricting the character of such a contract to one in which the parties have no interest in the event beyond the possibility of gain or loss, is too narrow. The several owners of various horses entered for a race have an interest, not only in the stakes, but in their respective horses and the speed to be developed by each. Our Supreme Court, in Monroe v. Smelly, supra, further said:

"We think that it certainly tends to the detriment of the public that the time of the court should be consumed in the investigation of the most idle or frivolous matters about which the parties who lay the wager have no interest, to the delay of causes of the greatest magnitude, perhaps, and certainly to the delay of the ordinary business transactions of life."

In the case of Burney v. Blanks, 136 S. W. 806, Key, Chief Justice, held that the sale of 133 bales of cotton at 10.81 cents per pound, paid at the time of the sale, was a valid transaction to that extent, but condemned that part of the contract wherein it was provided that on a subsequent named date the parties should have a further settlement, to be based upon the price of cotton on such date. Although the parties in this case had an interest in the property which constituted the subject-matter of the wager, we think the element of chance taints the entire transaction, and that upon the facts set out above neither party is entitled to recover anything in a suit or cross-action based upon it. In Brua's Appeal, 55 Pa. 294, it is said:

"Anything which induces men to risk their money or property without any other hope of return than to get for nothing any given amount from another is gambling."

The uncertain fact in the instant case, of course, was the number of bushels of wheat contained in plaintiff's ricks. Comer estimated the amount at from 5,000 to 6,000 bushels, and was willing to "back his judgment" by staking his labor, together with the expenses of thrashing it, and a guaranty of at least 4,350 bushels upon the result. Powell guessed the amount at considerably less, but in order to get his crop thrashed without cost and the assurance of 4,350 bushels, he was willing to hazard all over that amount. The result of the transaction is that he obtained something for nothing. If the ricks had contained 6,000 bushels Comer would have been liberally compensated for thrashing, but he would have obtained something for nothing. The whole matter is as if Comer had said to Powell:

"You think the ricks contain only 4,350 bushels. I will bet you the cost of thrashing them, together with enough wheat to net you 4,350 bushels, against all the excess which the ricks may contain, that I can thrash from them between 5,000 and 6,000 bushels"

—and Powell had accepted his offer. This is the kind of a contract which our Supreme Court, in Monroe v. Smelly, supra, condemned in the following language:

"Lastly, because a great majority of wagers are immoral in their tendency, in a plain and direct sense, and they all beget a desire, * * * to possess another's money or property without an equivalent, and this, if not an immorality in itself, opens the way to vice. It might not attract much attention for this court to render a judgment against a man for $1,000 lost at tenpins, or on the turn of a card, or on the issue of a fight between two dogs, but if a dozen such judgments should be rendered at every term of this court for the next five years, it would be a blot upon the jurisprudence of the state, from which it would not recover in half a century; and it might present to the people the spectacle of the courts prostituted to the odious instrumentality of stripping women and children of the common comforts of life because some one who owed them support and protection had been capricious enough to stake his substance upon a wager that he could throw a stone a thousand feet. * * * We cannot see, therefore, that a wager upon a game li-

·censed by law stands on any different footing from a wager upon any indifferent matter."

[2, 3] Gaines, Justice, in Willis v. Morris, 66 Tex. 628, 1 S. W. 799, 59 Am. Rep. 634, said:

"Expensive and complicated machinery propelled by steam power, or any power other than hand, is not exempt as 'tools of trade'; the latter phrase being held to apply only to simple instruments used by hand. Thomp. Homst. and Ex. § 756. The word 'apparatus,' used in the statute, may take a wider range, and embrace such minor machinery as may be operated by hand, and such·as courts of higher authority have held not to be included under the term 'tools,' as used in· similar enactments."

Upon this authority we hold· that the thrashing outfit was not exempt property. Since the contract was a wager, the ground in the affidavit 'for attachment that Comer was justly indebted to Powell is untrue, and the attachment was therefore wrongfully issued. Further than this we express no opinion upon the merits of the attachment proceeding.

[4] The writ having been wrongfully issued and levied, though not on exempt property, would, upon another trial, entitle Comer to recover at least nominal damages.

We have not · undertaken to discuss the many assignments in appellant's brief in detail, but what has been said disposes of the material questions presented.

The judgment in favor of Powell against Comer is reversed, and rendered that Powell take nothing. We further hold that Comer cannot recover any compensation for thrashing. As to all other issues the judgment is reversed, and cause remanded.